# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NAGHMEH PANAHI,<br>*individually, and as parent and*<br>*guardian of her minor children*<br>*R.A. and J.A.,*<br><br>          Plaintiff,<br><br>          v.<br><br>THE ISLAMIC REPUBLIC<br>OF IRAN<br>                    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 19-0006 (ABJ)<br>)  ** FILED UNDER SEAL **<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Naghmeh Panahi has brought this action individually, and as a parent and guardian on behalf of her minor children, R.A. and J.A., against the Islamic Republic of Iran under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq*. Compl. [Dkt. # 1] at 1. The complaint arises out of the detention and torture of her former husband, Saeed Abedini, by the government of Iran from July 2012 until January 2016,[1] and it seeks damages for the suffering endured by the worried members of his immediate family in the United States. Compl. at 13. Iran has not appeared to defend its conduct on these claims, so plaintiff has filed a Motion for Default Judgment. [Dkt. # 31] (SEALED) ("Pl.'s Mot."). Plaintiff's motion will be granted.

---

[1] The details of the brutality Saeed Abedini faced during his confinement are set out in detail in *Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 127, 129–30 (D.D.C. 2019).

**FINDINGS OF FACT**

The following findings of fact are based on the declaration of Naghmeh Panahi and a copy of the declaration of Saeed Abedini submitted in his own case,[2] as well as the documentary evidence supplied by the plaintiff in support of her motion.

Plaintiff Naghmeh Panahi is a dual citizen of the United States and Iran who met her former husband while she was working in Iran as a Christian missionary.  Decl. of Naghmeh Panahi, Ex. A to Pl.'s Mot. [Dkt. # 31-1] (SEALED) ("Panahi Decl.") ¶¶ 1–3.  He was an Iranian citizen at the time.  *Id*. ¶ 3.  Saeed and Naghmeh married in 2004 in Iran, and they emigrated to Boise, Idaho, in 2005.  *Id*. ¶¶ 3–4.  They had their daughter, R.A., in 2006, and their son, J.A., in 2008, and both are American citizens.  *Id*. ¶ 5.  Saeed became a naturalized American citizen in 2010 by his marriage to Naghmeh.  *Id*. ¶ 9.

The complaint alleges that in July 2012, Saeed traveled to Iran as part of his ongoing efforts to help build an orphanage there.  Panahi Decl. ¶¶ 8, 10.  As Saeed was traveling into Iran from Georgia on July 28, 2012, he was removed from a bus by the Iranian Revolutionary Guard, interrogated by Iranian military personnel, and placed under house arrest at his parents' house in Tehran.  *Id*. ¶ 11.  Over the next two months, Saeed was able to stay in touch with the plaintiff and R.A. and J.A.  *Id*. ¶¶ 12–16.  However, on September 26, 2012, the Iranian Revolutionary Guard raided Saeed's parents' house and forcibly took Saeed to an Iranian state prison.  *Id*. ¶¶ 17–18.

---

2       Permission to unseal the Declaration of Saeed Abedini was granted for the limited purpose of pursuing the instant case against the Islamic Republic of Iran.  *See* Resp. to Unopposed Mot. to Intervene by Naghmeh Panahi [Dkt. # 24]; Min. Order (Sept. 23, 2019) for Hearing on Naghmeh Panahi's Mot. to Intervene in *Abedini v. Gov't of the Islamic Republic of Iran*, Case No. 1:18-cv-0588 (JEB).

For approximately three months, plaintiff and her children received information about Saeed's status through weekly telephone calls he was permitted to make to his parents. Panahi Decl. ¶¶ 21–24.   But in December 2012, plaintiff learned that her husband had been hospitalized with injuries from a beating in the Iranian state prison.  *Id.* ¶ 27.  Saeed sent Naghmeh a detailed letter, describing the treatment to which he had been subjected in Evin Prison, including torture, interrogations, and solitary confinement.  Ex. B to Pl.'s Mot. [Dkt. # 31-1]; Panahi Decl. ¶ 27.  On December 19, 2012, Naghmeh made an appearance on Fox News to discuss Saeed's imprisonment, and she embarked on a media campaign thereafter to exert pressure on Iran to release Saeed.  Panahi Decl. ¶¶ 29–33.

In the following months, plaintiff received letters from Saeed about ongoing physical and psychological torture, squalid living conditions, and the denial of medical care.  Exs. C and D to Pl.'s Mot. [Dkt # 31-1]; Panahi Decl. ¶ 38.  Throughout this time, plaintiff also received threatening messages and phone calls from individuals who claimed they represented the Iranian government. Panahi Decl. ¶¶ 15, 37.  Nearly a year after he was abducted, Saeed was convicted and sentenced to eight years' imprisonment.  *See* Ex. E to Pl.'s Mot. [Dkt. # 31-1] ("Iranian Prison Sentence"). He was taken to the Rajai Shahr Prison where he remained in fear for his life and reached out to plaintiff by phone every night.  Panahi Decl. ¶ 43.

In 2014, Saeed suffered from internal bleeding and spent several more months in the hospital.  Panahi Decl. ¶¶ 46, 48.  After he was returned to the prison in May of 2014, he again managed to obtain a phone and access to the internet.  *Id.* ¶ 48.  By November of 2015, plaintiff had begun to suspect that the Iranian government was enabling Saeed to inform her of the details of his dire situation knowing that she would publicize them, and that Iran intended to use the media

3

coverage and her husband's situation "as leverage with the American government in their ongoing nuclear talks and trade negotiations." *Id.* ¶ 49.

Saeed's relationship with plaintiff and their two children suffered during this time.[3] Plaintiff describes the toll that imprisonment exacted on Saeed's psychological well-being, and she recounts that towards the end of his imprisonment, Saeed began to "view[] her as his enemy, and would verbally attack [her]." Panahi Decl. ¶ 50. When Saeed became "increasingly verbally and emotionally abusive," plaintiff cut off communications with him "for [her] own survival and for the sake of [their] children." *Id.* ¶¶ 50, 51. When Saeed was released from prison in January 2016, he was angry and threatened to take the children away, and plaintiff was afraid for herself and her children "given Saeed's severe psychological damage from inside Iranian prisons." *Id.* ¶ 52. His "lasting psychological damage" led to the couple's divorce,[4] which she declares "only increased the stress and suffering" that she and her children suffered. *Id.* ¶ 56.

On March 16, 2018, Saeed Abedini, along with his sister Zibandeh Abedini Galangashy, filed their own civil action for damages against the Islamic Republic of Iran, and a default judgment was entered in their favor on November 13, 2019. *Abendini*, 422 F. Supp. 3d at 126–27. The court awarded total damages of $44,621,460 to Saeed and $2,547,716 to Zibandeh. *Id.* at 126.

---

3    *See*

4



On January 2, 2019, plaintiff filed the complaint in this case along with an offer to arbitrate the matter. *See* Compl.; Notice of Offer to Arbitrate [Dkt. # 2]. Plaintiff Naghmeh Panahi has asserted intentional infliction of emotional distress as a theory of recovery, and she seeks solatium and punitive damages for herself and her minor children, R.A. and J.A., Compl. at 10–13, as well as economic damages for herself. *Id*. at 11. On January 11, plaintiff's counsel filed an affidavit seeking to effectuate service by mailing the summons and complaint to the Islamic Republic of Iran in Tehran, Iran, along with copies of those pleadings in the official language of the foreign state, pursuant to 28 U.S.C. § 1608(a)(3). Affidavit Requesting Foreign Mailing [Dkt. # 9]. On January 15, plaintiff filed a Request that the Clerk of the Court assist to effect foreign mailing. Pl.'s Request to Clerk of Court [Dkt. # 10] ("First Service Request"). On January 16, the Clerk of the Court docketed a certificate of mailing indicating that two copies of the summons, complaint, and notice of suit, together with a translation of each into the official language of Iran, had been mailed by registered mail to the head of the ministry of foreign affairs of Iran pursuant to 28 U.S.C. § 1608(a)(3). Certificate of Clerk [Dkt. # 11] ("First Certificate of Clerk"). The summons was returned unexecuted on January 18. Summons Returned Unexecuted [Dkt. # 13]. That process was repeated by plaintiff and the Clerk of the Court twice more between January 22 and March 11, 2019, when the summonses were once again returned unexecuted.[5]

The U.S. Embassy in Bern, Switzerland, sent a Diplomatic Note to the Swiss Ministry of Foreign Affairs on March 22, 2019, requesting judicial assistance from the Embassy of

---

5       *See* Affidavit Requesting Foreign Mailing [Dkt. # 12], Pl.'s Request to Clerk of Court [Dkt. # 14] ("Second Service Request"), Certificate of Clerk [Dkt. # 15] ("Second Certificate of Clerk"), Affidavit Requesting Foreign Mailing [Dkt. # 16], Pl.'s Request to Clerk of Court [Dkt. # 17] ("Third Service Request"); Certificate of Clerk [Dkt. # 18] ("Third Certificate of Clerk"); Summons Returned Unexecuted [Dkt. # 19]; Summons Returned Unexecuted [Dkt. # 20].

Switzerland in Tehran to effect service of the summons.  Ex. 1 to Notice of Suppl. Service Docs. [Dkt. # 22-1] ("Embassy Service Docs.") at 95–96.  On May 8, 2019, the Clerk of the Court received a letter from Jared N. Hess, an Attorney Adviser at the United States Department of State, Overseas Citizens Services Office of Legal Affairs, stating:

> Because the United States does not maintain diplomatic relations with the Government of Iran, the Department of State is assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran in delivering these documents to the Iranian Ministry of Foreign Affairs. These documents were delivered to the Iranian Ministry of Foreign Affairs under cover of diplomatic note No. 1026-IE, dated and delivered on April 14, 2019.

Return of Service Affidavit [Dkt. # 21] at 1.  The submission included a copy of the authenticated certificate of service.  *Id*. at 3.

On May 31, 2019, plaintiff's counsel supplemented the record with additional documents showing proof of service by the Swiss Federal Department of Foreign Affairs on the Islamic Republic of Iran.  *See* Notice of Suppl. Service Docs. [Dkt. # 22] ("Notice of Suppl. Service"); Embassy Service Docs.  The Swiss Federal Department stated in a letter that it transmitted the documents to the Iranian Ministry of Foreign affairs on April 14, 2019, and "[t]he reception of the mentioned documents was refused the same day by the Iranian Ministry of Foreign Affairs." Embassy Service Docs. at 2.

On June 24, 2019, plaintiff requested that the Clerk of the Court enter default against Iran, Pl.'s Request for Entry of Default [Dkt. # 25], which was entered on the same day.  Clerk's Entry of Default [Dkt. # 28].  Because plaintiff failed to take any action after that date, on September 17, 2019, the Court ordered plaintiff to file notice with the Court by October 1 as to why the case should not be dismissed for want of prosecution.  *See* Min. Order (Sept. 17, 2019).  On September 30, plaintiff filed the instant motion for default judgment, *see* Pl.'s Mot., along with six

unsealed and nine sealed exhibits.  *See* Exs. A–O to Pl.'s Mot. [Dkt. ## 31-1] (SEALED); Pl.'s Notice of Filing in Resp. to Min. Order (Sept. 30, 2019) [Dkt. # 30] at 1–2.

## LEGAL FRAMEWORK

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise."  Fed. R. Civ. P. 55(a).  And under Federal Rule 55(b)(2), the Court may consider entering default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor the resolution of genuine disputes on their merits," and therefore, "[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party."  *Jackson v. Beech*, 636 F.2d 831, 832, 836 (D.C. Cir. 1980) (internal quotation omitted).

When a default judgment is sought under the FSIA, a claimant must "establish[] h[er] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  As the D.C. Circuit has explained, "the statute has always authorized the courts to enter default judgments against defendants who refuse to appear.  With these provisions, Congress aimed to prevent state sponsors of terrorism – entities particularly unlikely to submit to this country's laws – from escaping liability for their sins."  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), citing 28 U.S.C. § 1608(e).  But "the entry of a default judgment is not automatic," *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted), and a court must still be satisfied that it has subject matter jurisdiction over the action, *see Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017), as well as personal jurisdiction over the

defendant.  *See Mwani*, 417 F.3d at 6.  Here, there is no question that the court has both subject

matter jurisdiction and personal jurisdiction.

## ANALYSIS

### I.        Subject Matter Jurisdiction

Section 1330 of the FSIA directs that unless a foreign state has immunity under sections

1605–07 of the FSIA or pursuant to an international agreement, a district court has "original

jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign

state[.]"  28 U.S.C. § 1330(a).  And the statute itself creates an exception to sovereign immunity

for acts of terrorism.  *See* 28 U.S.C. § 1605A(a)(1) ("A foreign state shall not be immune from the

jurisdiction of courts of the United States . . . in any case not otherwise covered by this chapter in

which money damages are sought against a foreign state for personal injury or death that was

caused by an act of torture[.]").   The exception requires that to hear a claim brought under

section 1605A, the claimant must establish that "(i) the foreign country was designated a 'state

sponsor of terrorism at the time [of] the act,' (ii) the 'claimant or victim was' a 'national of the

United States' at that time, and (iii) the 'claimant has afforded the foreign state a reasonable

opportunity to arbitrate the claim.'"  *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14

(D.C. Cir. 2015), quoting 28 U.S.C. § 1605A(a)(2).

"Iran has been designated a state sponsor of terrorism since 1984," so plaintiff satisfies the

first criterion.  *Mohammadi*, 782 F.3d at 14.  Plaintiff has also satisfied the second:  she states in

her complaint and motion that she and her children are American citizens, and a United States

House of Representatives Resolution, included as Exhibit I to plaintiff's motion, shows that Saeed

was a dual Iranian-United States citizen at the time of his detention in Iran.  *See* Compl. ¶¶ 1–4;

[Dkt. # 30-10] at 1.  And because plaintiff filed an offer to arbitrate on the same date she filed the

complaint, *see* Notice of Offer to Arbitrate, which was transmitted to the Islamic Republic of Iran through the Swiss submission, *see* Suppl. Service Docs. at 4, 62; *see also Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) ("The FSIA . . . does not require any particular form of offer to arbitrate, simply the extension of a 'reasonable opportunity.'"), she has also satisfied the third requirement.  Thus, the Court is satisfied that it has subject matter jurisdiction over the matter pursuant to section 1605A of the FSIA.

## II.    Personal Jurisdiction

The Court is also satisfied that it has personal jurisdiction over the Islamic Republic of Iran.   Section 1330(b) of the FSIA governs personal jurisdiction over foreign states. 28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."); *see Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) ("[T]o sue a foreign state . . . , a plaintiff must effect service in compliance with the Foreign Sovereign Immunities Act.").

Section 1608 provides "four methods of service in descending order of preference," *Barot*, 785 F.3d at 27, and the D.C. Circuit requires "strict adherence to the terms of [the Act]." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994).

Under the FSIA:

(a)  Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

9

> (3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned; or
>
> (4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).  To comply with section 1608, "a plaintiff must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (internal quotation omitted).

Here, service under sections 1608(a)(1) and (a)(2) was not possible.  The plaintiff had no special arrangement with Iran, so she was not required to comply with section 1608(a)(1), and because Iran has failed to join any relevant international conventions, section 1608(a)(2) was also not an option.  *See Levinson v. Islamic Republic of Iran*, 443 F. Supp. 3d 158, 175 (D.D.C. 2020) ("Because Iran does not have a special arrangement for service with the [claimants], nor is it a party to an international convention on service, the [claimants] did not need to attempt service in accordance with §[§] 1608(a)(1) or (a)(2)."); *see also Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 88 (D.D.C. 2018); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008).  Thus, the first service option available to plaintiff was section 1608(a)(3).

### A.  Service Under § 1608(a)(3)

Section 1608(a)(3) has five elements, all of which have been satisfied through plaintiff's efforts.  A plaintiff must (1) send "a copy of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state," (here, Farsi) (3) by any form of mail requiring a signed receipt, (4) to be addressed and dispatched by the clerk of the court (5) to the head of the ministry of foreign affairs of the foreign state concerned (here, Mohammad Javad Zarif).  *See* 28 U.S.C. § 1608(a)(3).

Plaintiff's first attempt at service under section 1608(a)(3) occurred between January 11 and January 16, 2019.  *See* First Service Request; First Certificate of Clerk.  On January 11, 2019, the plaintiff requested that the Clerk of the Court mail case documents, including the "Complaint," "Summons[,] and Notice" along with "[a] copy of each . . . translated into Farsi" to Iran, via DHL.  First Service Request.  However, plaintiff failed to comply with the fifth element of § 1608(a)(3) at that time.  Per the plaintiff's request, the Clerk's January 16 mailing was addressed to the "Islamic Republic of Iran, Ministry of Foreign Affairs, Amam Khomeni Avenue, United Nations Street, Tehran, Iran."  First Service Request; First Certificate of Clerk.  Because section 1608(a)(3) requires mailing not just to "the ministry of foreign affairs of the foreign state concerned" but "to the 'head of' the ministry of foreign affairs of the foreign state concerned," 28 U.S.C. § 1608(a)(3), plaintiff's first attempt did not "strict[ly] adhere[] to the terms of [section] 1608(a)." *Transaero*, 30 F.3d at 154.

But by January 22, 2019, plaintiff submitted a renewed request to the Clerk of the Court, Second Service Request, and the Clerk filed a Certificate of Mailing with the Court on January 25.  Second Service Request; Second Certificate of Clerk.  This time, the mailing address listed the Iranian Minister of Foreign Affairs, Mohammad Javad Zarif, in the address line, and unlike the

first mailing, was sent via "registered mail, return receipt requested" instead of DHL.  Second Certificate of Clerk.[6]   Although this attempt at service was unsuccessful, it satisfied the requirements of section 1608(a)(3).

### B.  Service Under § 1608(a)(4)

Finally, "if service cannot be made within 30 days under paragraph (3)," a plaintiff must effectuate service under section 1608(a)(4).  28 U.S.C. § 1608(a)(4).  That section has seven elements that must be satisfied.  A plaintiff must (1) send "two copies of the summons and complaint and a notice of suit," (2) "together with a translation of each into the official language of the foreign state" (here, Farsi), (3) "by any form of mailing requiring a signed receipt," (4) "to be addressed and dispatched by the clerk of the court" (5) "to the Secretary of State in Washington, District of Columbia," (6) "and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state" (7) "and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.*

On February 27, 2019, thirty-three days after the plaintiff attempted service under section 1608(a)(3), the plaintiff "request[ed] that the Clerk mail a copy of the summons and complaint" to Iran, "pursuant to the provisions of . . . 28 U.S.C. § 1608(a)(4)."  Affidavit Requesting Foreign Mailing [Dkt. # 16].  Later that day, the Clerk sent via FedEx "[t]wo copies of the summons, complaint[,] and notice of suit, together with a translation of each into [Farsi]" to the Director of Overseas Citizens Services at the U.S. Department of State."  Third Certificate of Clerk.  These steps satisfied elements one through five.  *See* 28 U.S.C. § 1608(a)(4).

---

6       Although it is unclear whether the January 16 mailing required a signed receipt upon delivery, the January 25 mailing did, and, thus, satisfied the "any form of mail requiring a signed receipt" element of section 1608(a)(3).

On May 31, 2019, plaintiff filed the supplemental service documents.  *See* Notice of Suppl. Service; Embassy Service Docs.  They reveal that on April 10, 2019, the U.S. Department of State transmitted the documents required under section 1608(a)(4) to the Swiss Embassy in Tehran, Iran, Embassy Service Docs. at 2, and that on April 14, 2019, the Swiss diplomats sent the documents, along with a diplomatic note, to the Iranian Ministry of Foreign Affairs, and the Ministry refused to receive the documents.  *See id.* at 4.  It is of no moment to this Court's analysis that Iran refused to accept the documents, *see Levinson*, 443 F. Supp. 3d at 175; *Fritz*, 320 F. Supp. 3d at 89; *Ben-Rafael*, 540 F. Supp. 2d at 52, and the record shows that as of May 21, 2019, plaintiff had fully complied with the requirements of 28 U.S.C. § 1608(a)(4) and properly served Iran under the FSIA.

### III.    Liability for Intentional Infliction of Emotional Distress

As other courts in this district have noted, "plaintiffs in § 1605A actions . . .  must articulate the justification for such recovery, generally through the lens of civil tort liability."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010).

Here, plaintiff proceeds on a claim of intentional infliction of emotional distress.  Compl. at 10–11.  The D.C. Circuit has advised that because actions for damages under the FSIA stem from a statutory right to recover and not a federal common law, and a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," the FSIA "in effect instructs federal judges to find the relevant law, not to make it."  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003), quoting 28 U.S.C. § 1606.  To that end, the D.C. Circuit has noted that "federal courts in FSIA . . . cases have accepted § 46 of the RESTATEMENT (SECOND) OF TORTS as a proxy for state common law of intentional infliction of emotional distress."  *Id*.

Section 46(2) provides:

> (2) Where [outrageous conduct causing severe emotional distress] is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
>
> > (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm . . .

Restatement (Second) of Torts § 46(2).   Recovery is permitted by members of the victim's immediate family who were not present, though, if "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present." *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019), quoting *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26–27 (D.D.C. 2009).

These elements have been satisfied in this case.  It has been recognized by both a district court and Congress that Iran was responsible for Saeed's detention and torture.  *See Abedini*, 422 F. Supp. 3d at 132 ("There can be no question that Iran caused [Saeed's] injuries."); House Resolution 111 (Feb. 13, 2015), Ex. I to Pl.'s Mot. [Dkt. # 30-10] at 1 (stating that the Islamic Republic of Iran arbitrarily held and tortured Saeed).  And "torture ha[s] been deemed sufficiently outrageous to inflict severe emotional harm on family members who were not present." *Rezaian*, 422 F. Supp. 3d at 179, citing *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 49–50 (D.D.C. 2001); *see also Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 (D.D.C. 2001) (in hostage cases, when claimants are members of a victim's immediate family, they "need not be present at the place of outrageous conduct"),[7] *aff'd Bettis*, 315 F.3d at 335 ("Because we affirm

---

7       The court noted that:

"[H]ostage cases are unique in that they implicitly involve a physical separation of the plaintiff from the victim of the outrageous conduct.  As a matter of fact, a plaintiff's lack of presence is the *exact source* of his emotional distress.  Thus, if the Court were to limit recovery in hostage cases using a 'presence' test, plaintiff

the District Court's construction of 'immediate family' under subsection (2)(a), we offer no view on the substantive scope of the 'presence' requirements under § 46(2).").

Second, plaintiff and her children were, at the time of the relevant events, Saeed's immediate family for purposes of the Restatement.

Finally, given the facts set forth in the declaration submitted in support of the motion for default judgment, plaintiff has shown that Iran in fact caused her and the couple's children to suffer severe emotional harm.  Plaintiff avers:

- "At the time of [Saeed's] arrest, I was in the United States with our two minor children . . . . I was extremely scared for Saeed's well-being and felt overwhelming anxiety from the news of his seizure."  Panahi Decl. ¶ 12.

- From July until September 2012, when Saeed was under house arrest, "I felt constant fear" and "suffered great emotional distress and many sleepless nights at the prospect that my husband would not return."  *Id.* ¶¶ 14, 16.  Also, "[b]oth children missed their father deeply and were troubled by his absence."  *Id.* ¶ 16.

- "On September 26, 2012, my nightmare became worse.  I received a frantic phone call from Saeed's mother, who was wailing and crying about what had just occurred.  She informed me that soldiers of the Iranian Revolutionary Guard raided the home and took Saeed as their prisoner."  *Id.* ¶ 17.

- Immediately following Saeed's kidnapping, "I did not know . . . if he was still alive . . . . I was filled with so much fear, anguish, and anxiety."  *Id.* ¶ 19.  "We did not hear anything about Saeed's whereabouts for four days."  *Id.* ¶ 20.  On the fourth day, Saeed was able to communicate to his parents that he was held "in solitary confinement" and was later transferred to another cell within Evin Prison, "significant to me because [it is] a notorious prison known for torturing and killing prisoners."  *Id.*

- Saeed's regular telephone and video calls to his wife and children ceased.  *Id.* ¶ 21.  "[C]ontact with him was limited . . . . He could only make weekly phone calls to his parents, who would provide updates on Saeed's captivity."  *Id.*  "R.A. and J.A. repeatedly asked why Saeed would not call anymore and whether Saeed still loved them . . . . I finally

---

would never recover despite there being extremely strong evidence of significant emotional suffering."

*Jenco*, 154 F. Supp. 2d at 36 (emphasis in original).  In this case, Saeed's detention had the same practical effect.

told them that their dad was in the Iranian prison because of his faith and thus could not talk to them." *Id.* ¶ 22.

- "[M]y children's emotional suffering greatly increased.  Their little thoughts were constantly on an Iranian prison, the condition of the prison, and how their dad was doing. They asked me hundreds of questions about what the prison was like, how it looked, if daddy was hurt, and when . . . they would see him again." *Id.* ¶ 23. "[T]hey started having nightmares and would wake up in the middle of the night crying.  They would go to bed crying." *Id.*

- During this time, Iran used Saeed's captivity to raise hope that he would be released if bail money could be raised, but regularly changed the terms of bail and his imprisonment. *Id.* ¶¶ 24–25. "Saeed would call and tell us the Iranian government said he would be released, only to be told the next day that he would be hanged." *Id.* ¶ 25. "These tactics were psychological torture to R.A., J.A., and me.  We constantly worried about Saeed's safety . . . . Over time it was becoming clear that the Iranian government had no intention of releasing Saeed[,] and they were torturing us psychologically." *Id.* ¶ 26.

- Advocacy to free Saeed "took a physical and emotional toll" on the family, *id.* ¶ 32, as "I travelled at least two-to-three times a month" to speak in front of various human rights organizations. *Id* ¶ 31. "I would return from a flight and collapse at home, not having the energy to get up." *Id.*  ¶ 32. "R.A. and J.A. were always concerned about the safety of both their father and mother.  I was torn between our children and my desire to try to obtain Saeed's freedom." *Id.* ¶ 33.

- "I had two very hurting children that needed my attention . . . . This is one of the reasons why – after I stopped all of my travels in November of 2015 – I stayed home to be with my children and get them the help, company, and therapy they need." *Id.* ¶ 36.

- "Throughout my advocacy, I received messages and phone calls from anonymous individuals claiming to represent the Iranian government . . . . [who] threatened harm to me if I did not stop my advocacy.  My car tires were slashed a few times and knives were found in them . . . . It became necessary for me to have security at speaking events.  I began to fear for my life after hearing of possible attacks." *Id.* ¶ 37.

- Updates from Saeed continued to detail the physical and psychological torture he suffered in prison.  Exs. C and D to Pl.'s Mot. [Dkt. # 31-1]; ███████████████ .  Saeed was beaten, denied medical treatment, and kept in solitary confinement for weeks at a time. Ex. D to Pl.'s Mot.; Panahi Decl. ¶ 38.

- In September 2013, Iran convicted and sentenced Saeed to imprisonment for eight years, Ex. E to Pl.'s Mot. [Dkt. # 31-1], and in November 2013, transferred him from Evin Prison to Rajai Shahr Prison, "known for being one of Iran's harshest jails with numerous reports of systemic torture, murder, and mass executions." Panahi Decl. ¶ 40.  Saeed was placed in a cell "usually reserved for prisoners convicted of murder and/or who have killed other

inmates while in prison," *id*. ¶ 41, which "came as a terrible shock.  I spent my days and nights wailing and crying."  *Id*. ¶ 42.

▪ In Rajai Shahr Prison, Saeed was given access to a phone, and "he would call me and tell me of his suffering."  *Id*. ¶ 43.  "Because Saeed's days in Iran were my evening[s] and nights, I would be up all night talking to Saeed."  *Id*. ¶ 44.  "I slept approximately three-to-four hours a night and was often awakened by fear and anxiety."  *Id*. ¶ 45.

▪ Saeed's mental condition began to deteriorate.  "Saeed began viewing me as his enemy, and would verbally attack me and call me names . . . . He was angry no matter what I did and he became increasingly verbally and emotionally abusive."  *Id*. ¶ 50.  "I was forced to cease communications with him in October 2015 to protect myself from falling apart and being completely destroyed . . . . and cease my public advocacy.  *Id*. ¶ 51.  Saeed threatened divorce, *id*., and when he was released via prisoner exchange on January 17, 2016, he "told me he would take our children away."  *Id.* ¶ 52.  "The lasting psychological damage to Saeed and I caused our marriage to deteriorate.  Saeed filed for divorce in August 2016, six months after his release."  *Id*. ¶ 56.  The divorce, finalized in April 2017, "only increased the stress and suffering that my children and I have experienced."  *Id*.

▪ "Saeed's imprisonment had a severe and lasting impact on R.A., J.A., and me . . . . [M]y children and I suffered severe emotional distress knowing Saeed's life was in danger."  *Id*. ¶ 54.  This was compounded by "my consistent communication with Saeed and knowledge of the facts and circumstances of his imprisonment as the events were occurring."  *Id*. ¶ 55.

Given that showing, the Court finds that plaintiff has established Iran's liability under the FSIA.

## DAMAGES

The FSIA authorizes the recovery of "economic damages, solatium,[8] pain and suffering, and punitive damages."  28 U.S.C. § 1605A(c)(4).  The complaint here seeks solatium and punitive damages on behalf of plaintiff and her children, as well as economic damages for her lost income.  Pl.'s Mot. at 17–21.

---

8     "In the context of FSIA cases . . . [a solatium claim is] 'indistinguishable' from the claim of intentional infliction of emotional distress."  *Heiser*, 659 F. Supp. 2d at 27 n.4, quoting *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 (D.D.C. 2002).

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005), quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003) (internal quotation marks omitted). "Pain and suffering, past and future, are obviously . . . reasonably certain consequence[s] of torture." *Rezaian*, 422 F. Supp. 3d at 179, quoting *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017). A court may look to prior awards and expert testimony in determining a "reasonable estimate." *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012); *Heiser*, 466 F. Supp. 2d at 269. The Court concludes that the torture of Saeed was reasonably certain to cause emotional distress and economic hardship to his former spouse and their children while he was detained in an Iranian prison.

## I.   Compensatory Damages for Solatium and Pain and Suffering

Saeed Abedini was arrested by the Iranian Revolutionary Guard and held under house arrest beginning in July 2012, and he was incarcerated, subjected to torture, and cut off from his family for more than three years. *See Abedini*, 422 F. Supp. 3d at 126–27. A district court concluded that he should be awarded $22,310,730 in compensatory damages, including $21,898,000 for his pain and suffering. *Id*. at 142. How does one go about assessing what that did to his family?

A court may consider prior damage awards for pain and suffering and solatium as examples when determining what an appropriate award might be. *See Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). In this district, the court has unfortunately been called upon

on more than one occasion to quantify the unimaginable, and there are some guideposts to follow. In *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 70 (D.D.C. 1998), the court awarded $10 million to two women whose husbands who were held for terms of 44 and 63 months and were victims of torture.  Neither even knew if her husband was alive during the duration of his confinement.  *Id*.

Damages awarded for the pain and suffering of parents, siblings, and children of torture victims have generally been lower than the amounts awarded to a spouse.  *See Acosta*, 574 F. Supp. 2d at 29–30.  The court awarded $6.7 million to the daughter of a torture victim held for nearly seven years, *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000), and a similar award of $6.5 million was granted to each of the three daughters of a hostage held for more than six years.  *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 52 (D.D.C. 2001).  And in the case involving Saeed Abedini himself, the court awarded $1.25 million to his sister.  *Abedini*, 422 F. Supp. 3d at 142.

Courts have considered such factors as the closeness of the familial relationship and whether the suffering of the family member has been severe.  *See Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 20–21, 26–27, 30 (D.D.C. 2011) ($7.5 million awarded to the grandchild of the victim).  Furthermore, the length of the detention of the victim plays a role; "anguish is exacerbated when family members must live with the knowledge that their loved ones suffered horribly for an extended period of time . . . at the hands of their tormentors." *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 91 (D.D.C. 2002).  Applying this reasoning, the court once awarded $25.54 million to the spouse of a victim tortured in captivity for nearly seven years. *Anderson*, 90 F. Supp. 2d at 114.

Here, plaintiff requests $10 million each for herself and her two minor children, R.A. and J.A., for the emotional harm they experienced as a result of Saeed's detention and continued torture, which lasted more than three years.  Plaintiff's distress was compounded when her husband communicated the details of his confinement and injuries to her directly, in a manner that appeared to have been deliberately facilitated by Iran.  Panahi Decl. ¶¶ 48–49.  Furthermore, plaintiff's minor children were deeply frightened and saddened by their father's disappearance. *Id*.  ¶¶ 22–23, 33, 47, 54.  The court concludes, in line with prior awards, that plaintiff is entitled to $10 million and R.A. and J.A. are each entitled to $5 million for solatium damages and the pain and suffering they suffered in connection with their enforced separation from Saeed, their knowledge that he had been tortured and that his physical and mental condition was deteriorating, and their fear that they would never see him again.

## II.   Economic Damages

The FSIA permits recovery for economic damages, 28 U.S.C. § 1605A(c), including loss of prospective income.  *See Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015), citing Restatement (Second) of Torts § 906.  A plaintiff who is unable to work at her previous place of employment due to psychological and emotional injuries may recover for lost wages.  *See Reed*, 845 F. Supp. 2d at 214 (D.D.C. 2012).  A district court previously held that neglecting professional obligations and resigning voluntarily in order to advocate for a loved one's release from captivity merited an award for economic damages.  *Rezaian*, 422 F. Supp. 3d at 182–83 (victim's brother awarded nearly $1.2 million).  In order to determine the amount, the plaintiff must merely provide a "reasonable estimate" supported by "competent evidence" as "lost earnings are not hard to quantify."  *Moradi*, 77 F. Supp. 3d at 71.

Plaintiff requests economic damages in the amount of $249,690.00, representing the earnings she estimates she has lost since leaving her prior place of employment in 2014. Panahi Decl. ¶ 57.  Plaintiff states that was required to quit her full-time job in order to advocate for Saeed's release from Iranian custody and to care for R.A. and J.A. and their emotional needs. *See id*. ¶¶ 28–33, 36, 43–45.  She has supplied her income tax return from 2013, her last full year of employment, and multiplied her $49,938.00 salary by the six years she has not been able to work since then to care for her children full-time.  *Id*. ¶ 57; *see also id*. at 15–36.  The Court finds that this calculation is reasonable and supported by competent evidence in the form of plaintiff's 2013 tax returns.[9]  Therefore, the court determines that plaintiff should be awarded $250,000 in economic damages.

## III.   Punitive Damages

Finally, the court turns to the determination of punitive damages, which are appropriate in cases involving "outrageous conduct," Restatement (Second) of Torts § 908(1), and can be levied under the FSIA against a foreign state sponsor of terrorism.  28 U.S.C. § 1605A(c).  The purpose of punitive damages is to deter similar actions in the future.  *See Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012).  In determining the proper amount of a punitive damages award, the court evaluates four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Colvin v. Syrian Arab Republic*,

---

[9]    *See Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 41 (D.D.C. 2016) (granting economic damages for a plaintiff who provided "spreadsheets" of her financial records and a corroborating letter from her accountant and denying economic damages for the remaining plaintiffs for failure "to meet the minimum evidentiary threshold" by not supplying any documentation, such as tax returns); *cf. Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 39–40 (D.D.C. 2018) (denying economic damages for failure to provide any supplemental evidence), citing *Hill*, 328 F.3d at 684.

363 F. Supp. 3d 141, 163 (D.D.C. 2019), quoting *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 27 (D.D.C. 2017).

The factors weigh in favor of awarding punitive damages to plaintiff and her two children. According to a declaration of Dr. Mehdi Khalaji, an expert at the Washington Institute on the politics of Iran and the Middle Eastern Shiite community who has consulted for the White House, National Security Council, State Department, and others, *see* Ex. G. to Pl.'s Mot. [Dkt. # 31-1] ("Khalaji Decl.") ¶¶ 1–3, the abduction and torture of Saeed, a naturalized American citizen, violated international human rights law.  Khalaji Decl. ¶ 23.  The expert opines that Iran clearly intended to cause significant harm to plaintiff and her children – as Saeed's immediate family – in retaliation for their religious beliefs and in order to gain concessions from the United States.  *See* Khalaji Decl. ¶¶ 31–33; *see also Rezaian*, 422 F. Supp. 3d. at 183 ("Holding a man hostage and torturing him to gain leverage in negotiations with the United States is outrageous, deserving of punishment, and surely in need of deterrence.").  The need to deter this behavior is high, as Iran continues a pattern of torture.  *See generally* U.S. Department of State, *Iran's Assassinations and Terrorist Activity Abroad*, (May 22, 2020), https://www.state.gov/irans-assassinations-and-terrorist-activity-abroad/.  Finally, "Iran is a sovereign and has substantial wealth."  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 25 (D.D.C. 2016).  Another circumstance to be considered, though, is the fact that another court has already awarded over $23,500,000 in punitive damages arising out of the same set of facts and circumstances.  *See Abedini*, 422 F. Supp. 3d at 142.

Courts vary in the approach taken to calculate a punitive damages award.  There are three main approaches: (1) to multiply the foreign state's "annual expenditures on terrorism" by a factor of three to five, which is typically used in deadly terrorist attack cases, *Braun*, 228 F. Supp. 3d

at 87 (D.D.C. 2017); (2) to award "a fixed amount of $150 million per affected family," *id*.; or (3) to award "punitive damages in an amount equal to the total compensatory damages." *Moradi*, 77 F. Supp. 3d at 73.  This method was applied in the *Abedini* case.  422 F. Supp. 3d at 142.

Plaintiff requested a punitive damages award of $150,000,000 for herself and her two children, for a total of $450,000,000.  Pl.'s Mot. at 26.  In *Rezaian*, where Iran arrested and detained a dual American-Iranian citizen for nearly two years to gain bargaining power against the United States, the court adopted the second approach and awarded the plaintiffs $150 million in punitive damages.  422 F. Supp. 3d at 183–84.  But in that case, Jason Rezaian himself was one of the claimants.  *Id*.  Here, the primary victim of the unspeakable conduct has already obtained a punitive damage award against Iran to punish it for its actions, and it was calculated based on the amount of his compensatory damages, so the Court finds that a similar approach would be appropriate in this case.  Therefore, the Court will award $10,250,000 in punitive damages to the plaintiff and $5,000,000 to each of the two children for the additional and distinct harm that was visited upon Saeed's family members.

**CONCLUSION**

For the reasons outlined above, plaintiff's motion for default judgment [Dkt. # 31] is **GRANTED**.   The plaintiff has established to the Court's satisfaction, pursuant to 28 U.S.C. 1608(e), that the defendant, the Islamic Republic of Iran, detained and tortured her former husband Saeed, and is liable to plaintiff and her two minor children, R.A. and J.A., for their resulting injuries.  Plaintiff is awarded monetary damages in the following amounts:

| | |
|---|---|
| Solatium – Naghmeh Panahi | $10,000,000.00 |
| Solatium – R.A. | $5,000,000.00 |
| Solatium – J.A. | $5,000,000.00 |
| Economic damages | $250,000.00 |
| Punitive damages | $20,250,000.00 |
| *Total* | *$40,500,000.00* |

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE: October 26, 2020